```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
 2                        FORT WORTH DIVISION

 3   UNITED STATES OF AMERICA      )   4:16-CR-112-O(5)
                                   )
 4   v.                            )   Sentencing
                                   )
 5   MICHAEL WESLEY JOHNSON        )   October 3, 2016

 6

 7           BEFORE THE HONORABLE REED C. O'CONNOR
                  United States District Judge
 8                   In Fort Worth, Texas

 9

10   FOR THE GOVERNMENT:          MR. SHAWN SMITH
                                  US Attorney's Office
                                  801 Cherry St
11                                Burnett Plaza Ste 1700 Unit #4
                                  Fort Worth, TX 76102-6882
12                                817/252-5200
                                  Fax: 817-252-5455
13

     FOR THE DEFENDANT:           MS. EMILY LOUISE LaCHANCE
14                                Schneider Law Firm
                                  400 E. Weatherford Street
15                                Suite 106
                                  Fort Worth, TX 76102
16                                817/850-9955
                                  Fax: 817/769-3797
17                                emily@clientdrivenlaw.com

18   COURT REPORTER:             MR. DENVER B. RODEN, RMR
                                  United States Court Reporter
19                                1050 Lake Carolyn Pkwy #2338
                                  Irving, Texas  75039
20                                drodenrmr@sbcglobal.net
                                  Phone:  (214) 753-2298
21

22
         The above styled and numbered cause was reported by
23   computerized stenography and produced by computer.

24

25
```

1        (October 3, 2016.)

2            **THE COURT:**  This is case number 4:16-CR-112, the

3    United States versus Michael Wesley Johnson.

4            All right.  The Government is here represented by

5    Mr. Smith.  Ms. La Chance is here for the defendant.

6            Would you state your full name for the record.

7            **THE DEFENDANT:**  Michael Wesley Johnson.

8            **THE COURT:**  All right.  We are here for purposes of

9    your sentencing.

10           Counsel, did you and your client receive in a timely

11   manner a copy of the Presentence Investigation Report and the

12   Addendum?

13           **MS. LA CHANCE:**  We did, Your Honor, and I've gone

14   over both the original PSR and the Addendum with my client.

15   There was a Second Addendum that was filed last week that just

16   appeared to be a clarification that verified some information

17   he had given on medical records.  I did not take that to him

18   since it just verified information he had already provided.

19           **THE COURT:**  Okay.  Very good.  Thank you.  Did the

20   Government receive these documents?

21           **MR. SMITH:**  Yes, Your Honor.

22           **THE COURT:**  All right.  Now, you have filed some

23   objections to the drug quantity amounts in this case.  Do you

24   have evidence you want to present at this time?

25           **MS. LA CHANCE:**  I do briefly have some additional

1   evidence, Your Honor.  At the end of August in Judge McBride's

2   Court Mandy Turner testified, and I've confirmed this with the

3   U.S. Attorney, that there are, in fact, two Michael Johnsons,

4   one of them my client, the other one is someone from Oklahoma.

5        Now, while Mandy Turner does not put any drug

6   quantities on my client, I think there is now sufficient

7   evidence to show that there are two Michael Johnsons involved

8   in this conspiracy, two Mike Jones.

9        As attached in the Government's Response were two

10  phone numbers, one from Tiffany Bradberry and none from

11  Tiffany Billingsley.  My client fully acknowledges dealing

12  with Tiffany Bradberry and the number attributed to my client

13  in those records is 682-304-3315.  However, when you flip to

14  Billingsley's phone, the number attributed to that Mike Jones

15  or Michael Johnson is a 214 number.

16       I think that you now have more substantiated evidence

17  to show that maybe the drug quantity amounts are

18  overexaggerated in the PSR since they are two Mike Jones and

19  Michael Johnsons.

20       That's all I have related to those objections as far

21  as further evidence.

22       THE COURT:  Okay.  I think we need to hear testimony

23  in this case.

24       MR. SMITH:  I call Agent McCarty.

25       THE COURT:  Very good.  Come on up, please.

1        (Witness sworn.)

2             THE COURT:  Please come have a seat.

3        (Witness sworn.)

4             MIKE MCCARTY, GOVERNMENT WITNESS, was sworn

5                      DIRECT EXAMINATION

6   BY MR. SMITH:

7   Q.  Would you please state your name.

8   A.  Mike McCarty.

9   Q.  And your occupation?

10  A.  I'm a criminal investigator with Homeland Security.

11  Q.  And you're familiar with the facts of this case?

12  A.  Generally, yes, sir.

13  Q.  Can you tell us about the Michael Johnson that the Defense

14  counsel just referenced?

15  A.  Yes, sir, I can.  There are two subjects with the name of

16  Michael Johnson associated with the conspiracy.  However, the

17  other individual known as Michael Johnson, the one who resides

18  in Oklahoma, does not go by the alias Mike Jones.  Further, to

19  my knowledge, no one in the conspiracy is familiar with that

20  Michael other than Mandy Turner.

21  Q.  What interactions do you recall Mandy Turner has -- what

22  interactions does she have, that is Mandy Turner, with

23  Michael Johnson in Oklahoma?

24  A.  That Michael Johnson was Mandy Turner's customer.

25  Q.  She delivered to that Michael Johnson on several

1   occasions.  Is that right?

2   A.  Yes, sir.  As I recall, more than one occasion.

3   Q.  Okay.  And Mandy Turner does not know the Michael Johnson

4   here today for sentencing.  Is that right?  Or at least in a

5   drug context?

6   A.  To my knowledge, no, sir.

7   Q.  Okay.

8        MR. SMITH:  No further questions, Your Honor.

9        MS. LA CHANCE:  Just briefly, Your Honor.

10             CROSS-EXAMINATION

11   BY MS. LA CHANCE:

12   Q.  Agent McCarty, was Tiffany Billingsley ever shown a

13   picture of my client to identify?

14   A.  Tiffany Billingsley?

15   Q.  Correct.

16   A.  I don't know.

17   Q.  So you don't know if she ever confirmed through a picture

18   I.D. or anything whether or not the Michael Johnson in her

19   phone was, in fact, my client?

20   A.  I don't know.

21   Q.  You don't know?

22   A.  No.

23        MS. LA CHANCE:  Nothing further, Your Honor.

24        THE COURT:  Okay.  So I think though you should also

25   address just the drug amounts more generally, not just the

1   discrepancy between these two people but the underlying

2   objection before she offered additional information to that.

3         MR. SMITH:  Okay.  Well, the Government will call

4   Officer Crum for that.

5         THE COURT:  Very good.  Thank you.

6         THE WITNESS:  Yes, sir.

7   (Witness sworn.)

8         **CY CRUM, GOVERNMENT WITNESS,** was sworn

9                    **DIRECT EXAMINATION**

10  BY MR. SMITH:

11  Q.  Will you please state your name?

12  A.  Cy Crum.

13  Q.  And your current occupation?

14  A.  I'm a task force officer with the DEA Fort Worth office.

15  Q.  And are you familiar with the facts of this case?

16  A.  Yes, I am.

17  Q.  Let's talk about -- I guess we'll first start with

18  Tiffany Bradberry.  Do you have a report of her interview

19  there in front of you?

20  A.  I have a few of them, yes, sir.

21  Q.  Will you explain for us in general what kind of amounts

22  she attributes to the defendant Michael Johnson and over

23  generally what time period.

24  A.  Ms. Bradberry at one point was a girlfriend of

25  Mr. Johnson's.  During one period for approximately three

1  months they or -- would normally purchase, distribute,

2  redistribute approximately four ounces every day of

3  methamphetamine.

4  Q.  And who were they getting their drugs from?

5  A.  From Erica Ayala.

6  Q.  Okay.  And so what time frame approximately would that

7  have been?

8  A.  This would have been late 2014, 2015.

9  Q.  Okay.  Go ahead.  Does Ms. Bradberry say anything else

10  about Ms. Johnson?

11  A.  She described several of Mr. Johnson's customers to

12  include a Terry, last name unknown, Chris Stewart, who has

13  been arrested, indicted, and sentenced in a separate case, as

14  well as David Stewart.  He would distribute to those

15  individuals roughly between the time frame of September to

16  December 2014.

17  Q.  Was he, Mr. Johnson, getting his drugs -- his

18  methamphetamine primarily from Erica Ayala or did he have a

19  different source that Bradberry knew about?

20  A.  During this time period it was primarily Erica Ayala.

21  Q.  Go ahead.

22  A.  Give me one second.  In January of 2015 that was an

23  occasion where Michael Johnson obtained four ounces from the

24  front from Gavin Sequin and Shanda Hawkins.  Ultimately, he

25  didn't pay for that methamphetamine.  The term "front"

1  typically means receiving the dope and paying for it later.

2  Q.  And that's something that Bradberry had witnessed?

3  A.  I'm sorry?

4  Q.  Is that something that Bradberry had witnessed?

5  A.  Yes, sir.

6  Q.  Okay.  Is there anything more from Bradberry or is that

7  the sum of it?

8  A.  That's the sum of it.

9  Q.  Okay.  Let go on -- Since you mentioned Mr. Sequin, let's

10  go to Mr. Sequin.  Did he give information about Mr. Johnson

11  as well?

12  A.  I don't recall.

13  Q.  Okay.  Now let's talk about Jennifer Church.  Do you know

14  what information she provided as relates to this defendant?

15  A.  It Jennifer Church?

16  Q.  Or who -- What reports do you have there in front of you?

17  A.  The reports --

18       THE COURT:  Why don't we do this?  Why don't we take

19  a recess and I'll go to the next case and we will come back to

20  this case.

21       MR. SMITH:  Yes, Your Honor.

22    (Recess.)

23       THE COURT:  Okay.  So, we're back on the record now

24  in case number 4:16-CR-112, the United States versus

25  Michael Wesley Johnson.

1      **MS. LA CHANCE:**  Your Honor, I was just -- after

2   consulting with Agent Crum and the U.S. Attorney and comparing

3   notes and them showing me some additional stuff, we would

4   withdraw our objection.  I think we got some clarification on

5   that and I think we are in agreement that the drug amount is

6   under 15 kilos anyway, as you can see in the Addendum and

7   their response.

8      **THE COURT:**  Okay.  So you believe then that a correct

9   calculation of the guidelines in your client's case is what?

10     **MS. LA CHANCE:**  I'm sorry, Your Honor.  I think it's

11  calculated correctly in the Addendum.

12     **THE COURT:**  So total offense level 33, Criminal

13  History Category VI, range or 235 to 240.  Supervised release

14  of 3 years and a fine range of $17,500 to $1 million?

15     **MR. SMITH:**  Your Honor, I think, in just looking at

16  the Presentence Report, not the Addendum, but the Presentence

17  Report, I think the base offense level should be 34, that's

18  below 15 kilos, so it would be the 5 to 15 kilogram range.

19     **THE COURT:**  Just give me the Guidelines calculations

20  that have you agreed to.

21     **MR. SMITH:**  That would be 34 plus minus 3 for

22  acceptance would be 31.  And then whatever the Criminal

23  History was.

24     **MS. LA CHANCE:**  I believe, if I'm correct and I may

25  he mistaken, I don't have it in front of me, it's 188 to 235

1    is the correct Guideline range.

2           THE COURT:  Okay.  Very good.  So that -- that will

3    be the Guideline range.

4           MS. LA CHANCE:  Correct, Your Honor.

5           THE COURT:  All right.

6           MS. LA CHANCE:  I think we're in agreement on that

7    now and we got some clarity on that.

8           THE COURT:  So level 31, Criminal History Category

9    VI, Guideline range of 188 to 235, and a supervised release

10   range of 3 years?

11          MS. LA CHANCE:  Correct, Your Honor.

12          THE COURT:  Does the Government wish to be heard on

13   sentencing?

14          MR. SMITH:  No, Your Honor.

15          MS. LA CHANCE:  Thank you, Your Honor.

16          THE COURT:  You bet.

17          MS. LA CHANCE:  We had a substance abuse evaluation

18   done --

19          THE COURT:  I just want you no know you have I had

20   supplied to me a number of letters in advance and I have read

21   those letters.  I'm sorry for interrupting you, but I

22   neglected to tell you that in advance.  Now I will turn the

23   floor over to you.

24          MS. LA CHANCE:  Thank you, Your Honor.  We had a

25   substance abuse evaluation done on Mr. Johnson in preparation

1   for Sentencing.  However, due to the illness of the substance

2   abuse counselor and financial commitment to them, it didn't

3   get done in time to submit the other things that we did to the

4   Court.  However, if I could, I would just like to read a

5   couple of sentences from the report.  It was done by

6   Kelly Bolognese for the Center of Therapeutic Change.  In that

7   substance abuse evaluation, she states that the risk factors

8   indicate that his substance abuse disorder is directly

9   correlated to his criminal attitudes and behavior pattern.  In

10  addition, his substance use disorder is primary to his

11  criminal history.  It appears that substance use treatment

12  will considerably reduce his risk to re-offend.  Proper

13  substance use disorder treatment and achievement of long term

14  abstinence may alleviate further arrest.  She further goes on

15  to state that her recommendation is that Mr. Johnson

16  participate and complete a long term structured substance use

17  disorder treatment program which includes behavior

18  modification and risk reduction intervention.

19          This offense has been a huge wake-up call for

20  Mr. Johnson.  I think you can see from his criminal history

21  that basically he was committing such crimes that would help

22  him to get high.  He is not a violent person.  He is just

23  committing offenses such that he can support his drug

24  addiction.

25          This conspiracy overall has been a huge conspiracy

1   that has involved a lot of violent gang members and in my

2   opinion there's a big difference between a violent member of

3   the Aryan Brotherhood of Texas who is trafficking drugs all

4   over North Texas and Mr. Johnson who was introduced to drugs

5   by his father at a young age and has committed offenses and

6   brokered deals in order to support his habit.

7        I feel like in the justice system we should punish

8   accordingly.  We accept responsibility for first actions and

9   he accepts full responsibility for this offense.  However, we

10  are asking for a punishment that will also allow him to get

11  the long term substance abuse treatment that is recommended.

12  We would love to have the -- the opportunity to the RDAP

13  program, but I think what is suggested in the substance abuse

14  evaluation is something even more intensive.

15       Mr. Johnson has the support of his family.  If I can

16  just have his family stand briefly.  This is his support

17  system now.

18       **THE COURT:**  Thank you all for being here.

19       **MS. LA CHANCE:**  This is his support system now.  It's

20  no longer his father and the people that were involved in this

21  conspiracy.  It's been, like I said, a huge wake-up call for

22  him and I think what he really needs is to stop this behavior

23  and stop this revolving door with the criminal justice system,

24  get long term substance abuse treatment and that is going to

25  happen outside the doors of the BOP, unfortunately, to get the

1    huge amount of substance abuse treatment that he needs.

2         We would also ask that this sentence run concurrent

3    with the evading charge that he was brought over on a writ

4    for.  It is related and that is stated in the PSR.  In fact,

5    the agents were actually present when that happened.  He was

6    in custody for two different periods on that offense from

7    December -- be has been in custody since December 22nd, 2015,

8    on that, but also a brief period of time from January 13,

9    2015, to March 30, 2015.

10        I think the only other thing that I have is his

11   mother would like to come up and kind of speak and elaborate a

12   little bit more on the childhood issues she has noticed

13   personally with his substance abuse history.

14        **THE COURT:**  Would you go with the marshal, please.

15   Ma'am, would you raise your right hand and be sworn.

16     (Witness sworn.)

17        **THE COURT:**  I would be pleased to hear from you.

18        **THE WITNESS:**  Thank you.  My name is Debra Stewart

19   and I'm the mother of Michael Johnson.  I've been a school

20   teacher for 38 years.  When Michael was 4, he was diagnosed

21   with ADHD and recommended to take medication but his dad

22   wouldn't allow him to do so.  He felt that he could control

23   his own problem.  My ex-husband was very abusive verbally and

24   physically.  He was an alcoholic and eventually I found out he

25   was a drug user.  Before I got married, I didn't know much

1   about drinking or drugs.  Within the first three years of my

2   marriage my ex-husband had three DUIs.  One day came home from

3   work and was angry about something that happened to him at

4   work and he walked into the house and realized that supper

5   wasn't ready, so he grabbed me by the throat and tried to pull

6   me out of the house.  Michael came into the kitchen and

7   started yelling and screaming.  He was trying to pull me back

8   into the house.  Finally -- his dad's name is Mike -- so his

9   dad finally stopped and he left the house.

10          The next morning we woke up and I packed my bags and

11  Michael and I and his brother drove 36 miles to Texas.  We

12  went to my mom's house in Fort Worth.  The next day my

13  ex-husband was there begging to take us back, so my mom said

14  you all go talk about it, I will keep the boys here.  So I

15  told him I would give him another chance.

16          About six months later, after we went back to North

17  Carolina, Michael had a severe ear infection.  He wouldn't

18  stay still while his dad put eardrops down his ears Mike

19  slammed his head on the coffee table.  I jumped up yelling and

20  screaming, but he pushed me down.

21          One day Michael was gone playing video games with a

22  friend of his and he came home late and his dad started

23  beating him.  I was outside doing yard work and I heard him,

24  so I ran to the house.  The door was locked.  I couldn't get

25  in.  He had locked me oust.  So I busted in the window and

1    went into the house and got my son.  I told him that I was

2    leaving and this would be the last time that I would ever be

3    here.  We moved into an apartment in North Carolina with no

4    friends and no family.  One day when I was coming home from

5    picking up the boys from school a car load of boys pulled in

6    front of us and they were coming to get Michael and I told

7    them that I was going call the police, so they left.  I

8    decided then that I needed to go home, to come home back to

9    Texas, so we moved back home.

10         I know that as a mom I made mistake.  I know that I

11   have done things wrong.  I know that if I could change things

12   I would.  I have survived an abusive relationship, open heart

13   surgery, and the death of both of my parents, but by far this

14   is the worst thing a mother can endure.

15         I prayer every night for the health of my son, even

16   though he has a drug problem and he realizes that he needs

17   help.  He knows he has to face his responsibility.  The only

18   thing that I ask is for someone to help me get help for him

19   for his addiction and that he stays close to his family

20   members, the ones he has remaining.

21         Thank you, Your Honor.

22         **THE COURT:**  Thank you, ma'am.

23         **MS. LA CHANCE:**  That's all I'll have, Your Honor, but

24   I believe my client has some words that he would like to share

25   as well.

1        **THE DEFENDANT:**  My mom pretty much touched on

2   everything.  Your Honor, my name is Michael Johnson.  I'm 38

3   years old.  I have written a speech about my character.  I

4   also would like to apologize to you, Your Honor, the

5   Government, my wife, my family, and society.  I know no matter

6   what I can't change or erase my past awful.  All I can do is

7   make better decisions and choices to make sure I maintain my

8   sobriety.

9        I know because of all the stress and heartache I've

10  caused my family as well as myself, that everything I've

11  learned was a huge mistake.  I know in my heart now that will

12  definitely help me be a better husband, father, son, brother,

13  nephew, all around person, but most importantly, a better man.

14       Your Honor, I've learned no matter how much you learn

15  or talk about drugs it can only be achieved by growing into it

16  and experiencing it.  Things people have to go through are

17  life's lessons learned.  I grew up with an abusive father who

18  loves to drink, smoke marijuana, and use cocaine and cheat on

19  my mother.  Everything was wrong in my dad's eyes.  A lot of

20  times he would come home in a drunken rage and come in the

21  house and started hitting my mother.  He would always try to

22  justify it with something he thought we did wrong.  Other

23  times I would just give my dad reasons so he with quit beating

24  my mother and my brother.  He would lock them out of the house

25  while he beat me.  Eventually, the abuse I suffered spilled

1  over into school and I began acting out.  My mom started

2  receiving phone calls from school which lead to suspension

3  while my mother, being a teacher, had had enough and took me

4  to a counselor.  I was diagnosed with ADHD and ritalin.  When

5  my father found out they had placed me on medication, he

6  flipped out.  He said no, son, you don't take medication.  He

7  then took me, sat me down, and that's when he introduced me to

8  marijuana.  He said my son is not going to take pills.  He

9  thought he was helping me but really he was hindering me not

10  only with all the abuse and put downs but introducing me to

11  drugs to try to self-medicate my problems.  By the time I was

12  14 my mother she could no longer take my emotional and

13  physical abuse and she packed our stuff while my father was at

14  work and loaded up my brother and left.  The three of us went

15  to a co-worker's house.  My father began to flip out.  He

16  showed up several times at our school.  We had to move towns.

17  My mom had to change jobs.

18           That was still not enough.  Shortly after my mom's

19  brother, who is here today, came up to North Carolina, packed

20  us up, and we moved to Texas.  Finally, the nightmare was

21  over.  Upon our arrival in Texas, I was united with my cousin

22  who introduced me to meth.  I began to drink and use meth

23  daily which led to a lot of wrong decisions, choices, multiple

24  arrests, prison, and the situation I'm currently in.

25           Your Honor, part of growing up is learning from your

1  mistakes and learning from your mistakes to make better

2  choices.  With that being said, my best choice that I ever

3  made was my most recent.  I married the most wonderful woman

4  who has helped me grow in a positive way.  She is my rock, she

5  is my best friend, she is my support, and the woman I'm going

6  to start a family with and spend the rest of my life with.  In

7  all years my years and relationships I've never had such a

8  positive, christian woman to help guide me and keep me

9  focused.  She understands me.  She also has such a wonderful

10  family that's also very supportive of me and will do anything

11  to help me in any way.  They are all here today, too.

12        I beg Your Honor to please forgive me for my actions.

13  Give me a chance to turn my life around, start a family, and

14  put my past behind me once and for all.  Your Honor, I ask for

15  leniency, mercy, and also closure.  If given a chance, there

16  is no doubt in my mind I can be a successful, productive

17  member of society.

18        Thank you, Your Honor, and God bless you.

19        **THE COURT:**  Thank you.  I will now state the sentence

20  determined pursuant to Title 18 U.S.C.  Section 3553, treating

21  the Sentencing Guidelines as advisory only.

22        In arriving at a reasonable sentence, I have taken

23  into account primarily the conduct admitted in the Factual

24  Resume as well as those matters required to be considered by

25  3553.

1          It is the judgment of the Court that the defendant is

2   committed to the custody of the Federal Bureau of Prisons for

3   a period of 188 months.

4          This sentence shall run concurrent with any term

5   imposed out of the 35th Judicial District Court of Brown

6   County, Texas, and the case from CDC1 of Tarrant County,

7   Texas, and the 432nd District Court of Tarrant County, Texas.

8   All of those are to run currently.

9          I do not order a fine.

10          I do order a mandatory special assessment of $100.

11          I do order that you be placed on a term of supervised

12   release of 3 years.  While on release you shall comply with

13   standard conditions contained in this judgment as well as the

14   mandatory and special conditions stated herein.

15          Have you gone over those conditions with your client?

16          **MS. LA CHANCE:**  I have, Your Honor.

17          **THE COURT:**  Do you understand those conditions?

18          **THE DEFENDANT:**  Yes, sir.

19          **THE COURT:**  I order those conditions imposed in your

20   case.

21          Is there any objection to this sentence from the

22   Government?

23          **MR. SMITH:**  No, Your Honor.

24          **THE COURT:**  Any objections from the Defense?

25          **MS. LA CHANCE:**  Just a few things, Your Honor.  Will

1    he be given credit for the time he has -- I think there is an

2    issue with the BOP running the time concurrently as far as the

3    dates concerning that case from CDC 1 since it was in fact

4    related and involved in this conspiracy?

5            THE COURT:  Okay.  I'm going to order the sentences

6    to run concurrent.  I don't know how the Bureau of Prisons

7    will calculate those, so I don't -- I won't include in the

8    judgment a sentence that says all of that time is credited to

9    time served.  The judgment will say he is entitled to have

10   whatever sentence imposed there will run concurrent to this

11   sentence here.

12           MS. LA CHANCE:  Okay.  And then I also ask if he can

13   participate in the RDAP program?

14           THE COURT:  I will make that recommendation.

15           MS. LA CHANCE:  And the additional recommendation

16   that he stay close to home so he can be with the support

17   network now that --

18           THE COURT:  Yes.  I will make that recommendation as

19   well.

20           MS. LA CHANCE:  Thank you.

21           THE COURT:  Anything else?

22           MS. LA CHANCE:  No, Your Honor.

23           THE COURT:  Then I will order this sentence imposed

24   as stated.

25           To the extent you have the right to appeal you also

1   have the right to apply for leave to appeal in forma pauperis

2   if you are unable to pay the cost of an appeal and if you

3   decide to appeal your notice must be filed within 14 days.

4   Talk to your attorney about your appellate rights.

5          Anything else from the Government?

6          **MR. SMITH:**  No, Your Honor.

7          **THE COURT:**  From the Defense?

8          **MS. LA CHANCE:**  No, Your Honor.

9          **THE COURT:**  Then we are in recess.  Thank you both

10  for being here and good luck to you, sir.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, **DENVER B. RODEN**, United States Court Reporter for the

2    United States District Court in and for the Northern District

3    of Texas, Fort Worth Division, hereby certify that the above

4    and foregoing contains a true and correct transcription of the

5    proceedings in the above entitled and numbered cause.

6          **WITNESS MY HAND** on this 27th day of November, 2016.

7

8

9                                   /s/ Denver B. Roden

10                                  **DENVER B. RODEN, RMR**
                                    *United States Court Reporter*
11                                  1050 Lake Carolyn Parkway #2338
                                    Irving, Texas  75039
12                                  *drodenrmr@sbcglobal.net*
                                    **Phone:**  (214) 753-2298

13

14

15

16

17

18

19

20

21

22

23

24

25